IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ESTATE OF BEVERLY M. BERLAND, by its
personal representatives, Cindy Gilman
and Andrea Frazin,

        *Plaintiff*,

   v.

LAVASTONE CAPITAL LLC,

        *Defendant*.

No. 1:18-cv-02002-SB

---

Daniel R. Miller, Donald L. Gouge, Jr., Daniel A. Cohen, Jim Walden, Tricia R. Lyons, WALDEN MACHT & HARAN LLP, Philadelphia, PA.

        *Counsel for Plaintiff*.

Megan Ward Cascio, Sabrina M. Hendershot, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE; Julius A. Rousseau, III, Andrew Dykens, ARENTFOX SCHIFF LLP, New York, NY.

        *Counsel for Defendant*.

---

**MEMORANDUM OPINION**

---

September 28, 2022

BIBAS, *Circuit Judge*, sitting by designation.

When an illegal bet is made on how long a person will live, Delaware law dictates that any profits from that bet go to the person's loved ones. Though there might be some exceptions to that rule, none applies here.

A group of related companies, which I collectively call Coventry, used life insurance to bet on the lifespan of Beverly Berland. To start, Coventry facilitated buying an insurance policy on her life. While the insurance company could still contest the policy, it was held by a trust that Coventry helped create. Once the policy was in the clear, Coventry bought it and then resold it to Lavastone, the defendant here. When Berland died, Lavastone got a $5 million payout. That money must go to Berland's Estate.

## I. THE LIFE-INSURANCE WAGER

The facts are complex, involving a cast of Coventry companies, a nonrecourse loan, a trust, a sub-trust, an underwriter, a bank, and a broker. Before diving into the details, it will help to paint with a broad brush. Beverly Berland learned that she could make money by taking out an unneeded life-insurance policy and then selling it. D.I. 113 ¶¶ 20–22, 28–32; D.I. 92-13 at 6–7. Rather than pay the premiums out of pocket, she funded them with a loan secured by the policy itself. D.I. 113 ¶¶ 37, 40. That loan was administered by a Coventry company. *Id.* ¶ 33–35. When the loan came due, Berland sold the policy to another Coventry company. *Id.* ¶ 56. Because the sale price was more than the amount outstanding on the loan, she made a tidy sum, just as she had hoped. *Id.* ¶ 56. Meanwhile, the Coventry company turned around and resold Berland's policy to Lavastone, the defendant here. *Id.* ¶ 57.

2

Now, on to a more detailed account of the facts, over which I find no genuine dispute:

*1. Lavastone and Coventry enter into an origination agreement.* In 2001, Lavastone signed an origination agreement with Coventry First. *Id.* ¶ 3. Coventry First would sell Lavastone life-insurance policies that had entered the secondary market. *Id.*

These policies had to meet certain criteria. For example, the insured had to be sixty years or older, with a remaining life expectancy of fifteen years or less. *Id.* ¶ 5. And the policy had to be past the two-year contestability period, meaning the insurance company could not challenge its validity. *Id.* Lavastone bought many life-insurance policies through this agreement, including Berland's. *Id.* ¶¶ 5, 57.

*2. Berland connects with Simba.* In 2006, Berland, then in her mid-seventies, met with a company called Simba. *Id.* ¶¶ 19, 28; D.I. 94-1 at 89. Simba helped senior citizens make money by buying "excess (unwanted, not needed) life insurance" and then selling it on the secondary market. D.I. 113 ¶ 20. Clients did not need to put down any of their own money. Instead, Simba helped them get nonrecourse loans to finance the policy premiums. *Id.* ¶¶ 21, 25. That means the life-insurance policies themselves were the only collateral for these loans. *Id.* ¶¶ 25, 41.

Berland wanted in. After being assured that she faced no financial risk, she took out multiple life-insurance policies, including a Lincoln Benefit Life policy with a $5 million death benefit. *Id.* ¶ 32. *Compare* D.I. 87 ¶ 3, *with* D.I. 108 ¶ 3. That policy is the only one at issue.

*3. Simba helps Berland get a Coventry-administered loan.* To take out the policy, Berland needed to get a loan to pay for it. So Simba arranged for a nonrecourse loan from LaSalle Bank. D.I. 113 ¶¶ 33, 37. To get that loan, Simba first sent Berland's medical records to Coventry Capital. *Id.* ¶ 33. Coventry Capital was the lending-program administrator for LaSalle. *Id.* ¶¶ 33, 35. Coventry Capital then sent Berland's medical records to Coventry Servicing, which produced a report on Berland's life expectancy. *Id.* ¶ 34. In turn, Coventry Servicing sent that report to Lexington, an underwriter. *Id.* Once Lexington agreed to insure the loan, LaSalle issued it. *Id.* ¶¶ 7, 15, 34, 40.

*4. Berland signs the Coventry loan package, creating a trust.* Meanwhile, Coventry Capital, as program administrator for LaSalle, sent Berland a standard loan package. *Id.* ¶ 35. By signing that package, Berland created a Delaware trust called the "Berland Insurance Trust." *Id.* ¶ 36. The Trust would apply for and own Berland's life-insurance policy. *Id.* It would also be the policy's beneficiary. *Id.* ¶ 44.

The trustee was Wilmington Trust. *Id.* ¶ 36. Berland's life partner, Murray Roffeld, was the co-trustee and beneficial owner. *Id.* The Trust was established with a $1 contribution (which Berland did not pay). *Id.* A sub-trust of the Trust was the borrower on the nonrecourse loan. *Id.* ¶ 37. As part of the loan package, Berland also executed a "special irrevocable durable power of attorney." *Id.* ¶ 42. This authorized Coventry Capital to "originat[e] and or servic[e] any life insurance policies insuring [her] life." *Id.*

4

*5. Berland buys life insurance through the Trust.* Simba then sent an application for the Lincoln policy to Coventry Capital. *Id.* ¶ 45. That application falsely stated that Berland had $10 million in assets and $180,000 in annual income. *Id.* ¶ 47. In reality, Berland had $1.5 to $2 million in assets and an annual income of about $40,000. *Id.* ¶ 30. Coventry Capital forwarded Berland's application to Wilmington Trust. *Id.* ¶ 49. Wilmington Trust signed the application in Delaware as the Trust's trustee and policy owner. *Id.* Lincoln then delivered the policy to Wilmington Trust's Delaware address. *Id.* ¶ 51. Simba split its commission on the policy with Coventry. *Id.* ¶ 52.

*6. Coventry buys the Berland policy and resells it to Lavastone.* Three months before the nonrecourse loan came due, Coventry First and Lavastone did a "pre-offer" review of the Berland policy as part of their origination agreement. *Id.* ¶ 53. If Lavastone was willing to buy the policy, Coventry First would try to get it. *Id.*

Coventry Capital, as LaSalle's servicing agent, then sent Berland a reminder to pay off the nonrecourse loan or relinquish the policy. *Id.* ¶ 55. Berland controlled whether and to whom the policy could be sold. *Compare* D.I. 87 ¶ 17, *with* D.I. 108 ¶ 17. Indeed, Berland signed engagement letters with three separate life-insurance brokers. *Compare* D.I. 87 ¶ 18, *with* D.I. 108 ¶ 18. But she ultimately sold the policy to Coventry First for $453,822.88. D.I. 113 ¶ 56. She then used the proceeds to pay off the loan. *Id.* In the end, Berland was left with a profit of $73,594.05. *Id.*

*7. Lavastone gets the death benefit.* Lavastone immediately bought the policy from Coventry First for $681,471, according to their preexisting origination agreement. *Id.*

5

¶ 57. When Berland passed away in 2015, Lavastone got the $5 million payout. *Id.* ¶ 58.

Berland's Estate sued under 18 *Del. C.* § 2704(b) to recover the money. D.I. 44 ¶¶ 74–82. The parties now cross-move for summary judgment.

## II. THE LAW OF STRANGER-ORIGINATED LIFE INSURANCE

### A. Delaware law applies

First, I confirm that Delaware law applies. Lavastone makes a passing suggestion that Florida law governs because of a conformity clause in the life-insurance policy. D.I. 123 at 6. But a "conformity clause alone is *not* a choice of law provision." *Stillwater Mining Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2021 WL 6068046, at *10 (Del. Super. Ct. Dec. 22, 2021). Though a single clause could operate as both, the language must be "plain and clear." *Id.* Here, it is not. The clause is labeled "Conformity with State Law" and provides only that the insurer will treat the policy as if it complies with the "laws of the state where the application was signed." D.I. 113 ¶ 50. Indeed, the very case that Lavastone relies on for support found that a similar clause in another Lincoln life-insurance policy was not a choice-of-law provision. *See AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132–35 (2d Cir. 2018). And since both the Trust and Lavastone are in Delaware, I apply Delaware law.

### B. Delaware bans betting on someone's life

Like many jurisdictions, Delaware has outlawed gambling on human lives. *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1070–71 (Del. 2011); Del. Const. art. II, § 17. To make sure life insurance is not used to evade that ban, Delaware requires that a life-insurance policy have an insurable interest at the start.

*Price Dawe*, 28 A.3d at 1071–73; 18 *Del. C.* § 2704(a). In other words, the beneficiary of the policy must "expect some benefit or advantage" from the continued life of the insured. *Price Dawe*, 28 A.3d at 1069 (internal quotation marks omitted).

Policies that have an insurable interest are valid and can be legally sold on the secondary market. *Id.* at 1069–70. But those that lack such an interest at the start are void ab initio. *Id.* at 1067–68. Such policies, commonly known as "stranger originated life insurance" (STOLI), violate 18 *Del. C.* § 2704(a). *Id.* at 1073–74. And § 2704(b) lets the insured's estate recover any death benefit paid on a STOLI policy. *Wells Fargo Bank, N.A. v. Est. of Malkin*, 278 A.3d 53, 56 (Del. 2022).

There is one exception to the insurable-interest requirement: the insured herself can take out life insurance on her own life for the benefit of anyone. 18 *Del. C.* § 2704(a); *Price Dawe*, 28 A.3d at 1073–74. So that this exception is not used to facilitate a STOLI scheme, Delaware scrutinizes who in fact took out the policy. *Price Dawe*, 28 A.3d at 1075–76. If a third party used the insured as an "instrumentality to procure a policy that, when issued, would otherwise lack an insurable interest," the policy is void. *Id.* at 1074.

### C. The Delaware Supreme Court has answered my certified questions

To better understand how Delaware law applies to the dispute here, I certified three questions to the Delaware Supreme Court. The Court has answered those questions. *Lavastone Cap. LLC v. Est. of Berland*, 266 A.3d 964 (Del. 2021). I am grateful for its help.

First, I asked the Court whether a death-benefit payment on a void policy is made "under any contract" under 18 *Del. C.* § 2704(b). The Court said yes. *Berland*, 266

A.3d at 969–71. This means that if Berland's policy was void, her Estate can recover the death benefit.

Second, I asked whether Delaware law forbids an insured (or her trust) to take out a policy on her own life using a nonrecourse loan and, after the contestability period, sell it to someone without an insurable interest, if she never intended to maintain insurance coverage beyond the contestability period. The Court said no, so long as (1) "the use of nonrecourse funding did not allow the insured or … her trust to obtain the policy 'without actually paying the premiums'" and (2) "the insured or … her trust procured or effected the policy in good faith, for a lawful insurance purpose, and not as a cover for a wagering contract." *Id.* at 971–73 (quoting *Price Dawe*, 28 A.3d at 1076).

Finally, I asked whether an estate may profit under §2704(b) if an insurance policy in violation of §2704(a) was procured in part by the decedent's fraud and the decedent profited from the previous sale of the policy. The Court said yes, an estate may still profit "if the recipient of the death benefits cannot establish that it was a victim of the fraud." *Id.* at 973–75. And it reasoned that Lavastone cannot establish that it was such a victim. *Id.* In its most recent brief, Lavastone appears to have dropped that argument. *See generally* Lavastone Suppl. Br., D.I. 168.

With that helpful guidance in mind, I turn to the parties' cross-motions for summary judgment.

### III. LAVASTONE HAS NO RIGHT TO KEEP THE DEATH BENEFIT

Summary judgment is appropriate if there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party has the burden of proof. *Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992).

### A. Lavastone is not collaterally estopped from litigating whether the policy was void from the start

Berland's Estate says Lavastone's defense of the policy's validity can be nipped in the bud: Lavastone, it claims, was the real party of interest in prior lawsuits that declared void other policies funded under the same Coventry-administered loan. Berland Op. Br., D.I. 89 at 19–20. So, the Estate says, Lavastone is collaterally estopped from litigating whether the Berland policy is void. *Id.*

But to determine whether a policy is void, courts must "scrutinize the circumstances under which [it] was issued." *Price Dawe*, 28 A.3d at 1076. The circumstances here necessarily differ from those under which other policies were issued to other people. So this case does not present the "same issue" as past cases, and Lavastone is not barred from litigating the policy's validity. 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4417 (3d ed. 2022).

### B. The policy lacked an insurable interest and was void from the start

To decide whether the policy is void, I apply the two-pronged test that the Delaware Supreme Court set out in answering my certified questions. When a policy is paid for with a nonrecourse loan and the insured always intended to sell it at the close of the contestability period, it is void if either (1) the nonrecourse loan let the insured (or her trust) get the policy without "actually paying the premiums," or (2) the insured (or her trust) took out the policy in bad faith, "as a cover for a wagering contract." *Berland*, 266 A.3d at 966. Berland's policy fails both prongs and is thus void.

9

*1. Funding.* First, not a penny of the premium payments came out of Berland's pocket. D.I. 92-13 at 6. Instead, she used a loan administered by Coventry to fund them. D.I. 113 ¶¶ 33–35, 40. And as soon as the loan came due, she sold the policy to Coventry, using the proceeds to repay the loan. *Id.* ¶ 56.

Lavastone says that Berland, not Coventry, paid the premiums because she "had a bona fide obligation to repay" the loan and did, in fact, repay. D.I. 168 at 6. But Berland's obligation was illusory; she had no skin in the game. The policy was the only collateral for the nonrecourse loan. If she could not pay off the loan when it came due, she could have relinquished the policy and walked away. Plus, during the two years that she had the loan, she never made any payments. *Compare* D.I. 113 ¶ 40, *with id.* ¶ 56. When she finally did repay it, all that money came straight from Coventry, which had facilitated the loan in the first place. *Id.* ¶ 56.

Lavastone also says that Berland paid the premiums in that she "used a common financing option." D.I. 168 at 6. True, nonrecourse funding is a permissible way to pay for life insurance. *Berland*, 266 A.3d at 972. But such funding can also be "evidence of an impermissible STOLI scheme, especially [when it] means that a third party, and not the insured, bears the entire financial liability for obtaining the policy." *Id.* That was what happened here: third parties, not Berland, shouldered all the liability. *Cf. id.* at 972 n.27 (when life insurance is funded by a nonrecourse loan for a legal tax purpose, the insured still makes payments on the loan).

*2. Bad faith.* Nor did Berland take out the policy for a valid insurance purpose. Berland did not need life insurance. D.I. 113 ¶ 31. Her children were adults. D.I. 94-

10

3 at 66. Though she lived with Roffeld, her life partner, she did not pay his expenses. D.I. 113 ¶ 29. And no one at Simba ever spoke with Berland about using life insurance to mitigate risk or reduce her estate taxes. D.I. 92-13 at 6.

Rather, Berland took out the policy as a cover for a wagering contract, and the policy's real procurer was Coventry. Coventry had a preexisting arrangement to sell senior citizens' life-insurance policies to Lavastone. D.I. 113 ¶¶ 3–5. To do so, it needed inventory. Berland fit the bill, so Coventry helped her get insurance. At the outset, Coventry facilitated the nonrecourse loan that Berland used to pay the policy premiums during the contestability period. For example, Coventry collected her health records and generated the life-expectancy report necessary to secure the loan. *Id.* ¶¶ 33–34. It also administered the loan. *Id.* ¶ 35.

But Coventry's involvement did not end there. Coventry had Berland execute a "special irrevocable durable power of attorney," which let Coventry originate and service insurance policies on Berland's life. *Id.* ¶ 42. It also facilitated creating the trust that would own Berland's life-insurance policy. *Id.* ¶ 36. And it collected the life insurance application from Berland and sent it to the trust to sign. *Id.* ¶ 45–49.

During the policy's two-year contestability period, Coventry lay in wait. Then, as that period wound down and the loan neared maturity, Coventry prepared to harvest its reward. It asked Lavastone to consider buying Berland's policy. *Id.* ¶ 53. Lavastone said yes, so Coventry set out to get it. *Id.* ¶¶ 53–56. Although Berland controlled whether and to whom she sold the policy, she ultimately sold it to Coventry. *Id.* ¶ 53. Coventry's role in the origination of Berland's life-insurance policy and later purchase

11

of that policy shows that Coventry, not Berland, procured it. So it is void. Indeed, other courts have come to the same conclusion about policies funded through the same Coventry-administered loans. *See Est. of Malkin v. Wells Fargo Bank, N.A.*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019), *aff'd in relevant part*, 2022 WL 2285884 (11th Cir. June 23, 2022); *Sun Life Assurance Co. Can. v. U.S. Bank Nat'l Ass'n*, 369 F. Supp. 3d 601, 606 (D. Del. 2019); *U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co. of Can.*, 2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016), *report and recommendation adopted*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017).

Lavastone's efforts to avoid that conclusion here are unavailing. Lavastone asserts that Berland had a valid insurance purpose. First, it notes that Berland signed a form saying she was buying the policy "to meet a need for life insurance." D.I. 168 at 7. But technical compliance is insufficient. The very purpose of a STOLI scheme is to "feign technical compliance." *Price Dawe*, 28 A.3d at 1074. So even though Coventry made sure to have Berland dot her i's and cross her t's, Lavastone must point to something more.

Lavastone also says that the policy gave Berland life insurance during the contestability period. If Berland had died during that time, Roffeld, her life partner, would have received the payout as beneficiary of the trust that owned the policy. But Lavastone does not identify any evidence that Berland's purpose in buying the policy was to give Roffeld short-term insurance protection. *Cf. Berland*, 266 A.3d at 973. It does not explain why Roffeld needed the $5 million. D.I. 168 at 7–8. On the contrary, it acknowledges that Roffeld "paid for his and Berland's expenses." D.I. 113 ¶ 29. In

12

fact, though Lavastone has since pivoted, it originally admitted that Berland "wanted" life-insurance policies "so that she could sell them for money." *Id.* ¶ 31. Lavastone's new, unsupported assertion that Berland wanted to "provid[e] short term insurance protection to her loved ones in the event of her death" falls flat. D.I. 168 at 7.

## C. Lavastone's defenses fail

Trying to keep the death benefit, Lavastone scrapes together eleven defenses. D.I. 45 ¶¶ 117–129. Some are dead on arrival. In answering our certified questions, the Delaware Supreme Court nixed Lavastone's *in pari delicto* and unclean-hands defenses. *Berland*, 266 A.3d at 974. And in a similar case, it held that as a matter of law, a bona-fide-purchaser defense is unavailable if an insurance contract is void. *Malkin*, 278 A.3d at 56.

But other common-law defenses and counterclaims can remain available. Courts must "look to [their] elements" and "where appropriate, the public policy underlying the ban on human-life wagering." *Id.* at 62–63. Here, though, none of Lavastone's defenses applies.

*1. Lavastone's contract-based defenses fail.* Lavastone asserts various defenses based on the contract that Berland and her trust signed when selling the policy to Coventry. But that contract was used to effect a STOLI scheme. So it is void for the same reason the insurance policy is: it "violates Delaware's clear public policy against wagering." *Price Dawe*, 28 A.3d at 1067–68. Thus, none of the contract's provisions "ever legally came into effect," and I cannot enforce them. *Id.* Nor can estoppel be

13

used to resuscitate a void contract. *See Waggoner v. Laster*, 581 A.2d 1127, 1137 (Del. 1990); *see also Price Dawe*, 28 A.3d at 1067.

*2. Lavastone's other defenses fail.* Lavastone's remaining defenses fare no better. First, Lavastone says that Berland ratified the sale of her insurance policy because she "treated the sale as valid and enjoyed [its] benefits." D.I. 91 at 18. But "a decedent-insured's mere sale of the policy at a profit does not bar an estate's claim under Section 2704(b)." *Berland*, 266 A.3d at 975.

Lavastone also says that laches applies because the Estate's claim comes too late. D.I. 91 at 18. Berland, Lavastone complains, never acted to repudiate the sale of her policy while she was alive. *Id.* But the claim asserted here did not exist until after Berland's death. *See* 18 *Del. C.* § 2704(b) (providing a cause of action to recover benefits "accruing upon the death … of the individual"). The Estate cannot be faulted for waiting to bring a claim that had yet to materialize.

Lavastone's unjust-enrichment claim fails too. Lavastone may have conferred benefits upon the Estate by paying the premiums and thus keeping the policy in force. But it did so officiously. *Malkin*, 278 A.3d at 69–70. There are no allegations of coercion or request. And though Lavastone may have paid the premiums under the mistaken belief that it—rather than the Estate—would get the $5 million death benefit, that is not the sort of mistake that gives rise to a claim for unjust enrichment. *Cf. Metcap Secs. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *10 n.59 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) (holding that a company's mistaken belief that it would be compensated for its services is not the sort of mistake covered

14

by unjust enrichment). Finally, Lavastone's recoupment defense simply restates its unjust-enrichment defense and fails for the same reason.

\* \* \* \* \*

Lavastone took a risk when it agreed to buy senior citizens' life-insurance policies from Coventry. That risk does not pay off here. Berland's policy was void from the start. And Lavastone cannot satisfy the elements of the defenses it asserts. So I grant the Estate's motion for partial summary judgment and deny Lavastone's motion for summary judgment. I dismiss as moot the Estate's alternative cause of action for unjust enrichment and direct the Clerk to close this case.